Your Honors, Kim Zeldin may please the Court on behalf of Mr. Jerry Jamgotchian. The Foreign Arbitration Award issued against Mr. Jamgotchian should not have been recognized, confirmed or enforced because reasonable notice of the arbitrator appointment and of the proceedings was not provided and the arbitrator that was appointed was not appointed pursuant to the contract, the party's agreement which was the nomination agreements. In addition, the award should not have been enforced because it was against public policy of the United States because the arbitrator did not disclose his extensive financial affiliations with the Lindley petitioners before the arbitration of the dispute and he did not conduct a hearing or otherwise basis decision on evidence as opposed to mere representations of counsel. I'm going to turn first to reasonable notice. There's two aspects to reasonable notice. The first is the content and timing of the notice. Interestingly and importantly, the notice that should have been sent to Mr. Jamgotchian was not. That was the notice, the charging document, the demand for arbitration, the notice that the proceedings were going to be held in England before the TBA in England as opposed to the TBA in Ireland or the United States. It had some connection to this dispute. That document, which can be found at ER 151 through 206, which is a series of letters, was not served on Mr. Jamgotchian. Neither was the appointment by the arbitral panel, which is the English TBA. Those two documents are the documents that needed to be served on Mr. Jamgotchian and were not. The rest of the documents were irrelevant to the question about whether or not Mr. Jamgotchian could have actually had some kind of ability to respond. That CEEG case that I submitted from the Tenth Circuit in connection as new authority points out that was not served on Mr. Jamgotchian. Okay. So which notices, give me the dates, which notices were inadequate? The notices, I'll give you the dates of the two notices. They were not sent to Mr. Jamgotchian at all. Hold on a second. I'm sorry. I have the dates. So he sent a notice on, he sent a demand on the 18th of February. Mr. Breen, or Mr. Frye, actually, and Mr. Breen on his behalf, sent a notice on the 18th of February, then a notice on the 26th of February. Neither of those notices was sufficient because all those notices did was say, first, the first one was just a demand for payment and the second was, would you like to agree to an arbitrator, and if you don't agree to an arbitrator. But at least it puts him on notice that the things have gone wrong and they're now going to take up their arbitration rights, right? But that was a threat, not necessarily until there actually was a filing with the arbitral body. Okay. But you had notice that was given to him and they tried various ways of getting a hold of him. They tried various ways, but none of those actually satisfied due process because it wasn't. Why not? Because he never received the notice. Well, wait. I'm sorry. What case tells us that he has to actually receive them? There's no case that says he doesn't have to receive them. Counsel, I think that's your burden to show us that if you're going to. Yes, I understand. But I'm arguing that. If you're talking about, you know, Central Hanover v. Moline, this is notice reasonably calculated to advise. And so what was not reasonably calculated to advise your client? The notice that should have been provided was either personal service or some type of notice that actually. And where would they have served him? They should have served it at his home. They had his home address and they did not serve it at his home address. Did they mail it to his home? Where did they mail it? They mailed it to a P.O. box. They did not mail it to his home. They did not mail anything to his home. And they also mailed it to his lawyer. And they e-mailed it to him and e-mailed it to his lawyer. He told the lawyer said we do not, I'm not representing him. So that's not proper service. It wasn't an agent for service to process. Although they had previously had communications with that lawyer. They had previously had communications with that lawyer, but over a different dispute. Having to do with another Coolmore in Kentucky. They're a different set of horses. So, yes. So were they supposed to know at that point that Caswell was not representing him? They, whether they knew it or not, he told them that he wasn't. So he responded and said I'm not representing, so this service is no good. Did they have his home address? They did have his home address. That's in the testimony of Mr. Jamgosian. It was undisputed. They had his home address. And in fact, they eventually served him, they tried to serve him at his home address when they actually were doing the confirmation proceeding. So they tried to serve him there. They didn't get him there. So they actually, I think, served him. What was the P.O. box? The P.O. box was one of those kind of mail places. But in the 14 agreements that your client had with Lindley, your client provided an address, and that's the address they used in the agreements, right? Yes, but they also knew that he had a home address and they didn't give him, they didn't serve him at the home address. Why wouldn't they believe, why wouldn't it be reasonably calculated to reach him at the address that he provided? Well, my position is that's just constructive notice. The point here is that essentially you're getting a default judgment against somebody. It's the equivalent of essential, it's the equivalent of having a default judgment entered against you without having proper, real service of process like you would in this country, which is what you're entitled to. You're entitled to due process. If a default judgment is entered against you in this country, there's two things. One, you get personal service, and two, you get a prove-up hearing. Had he ever said, if you need to get in touch with me, contact me at my house? He used the P.O. box in prior communications with them, right? He did use the P.O. box. And they exchanged, they had regularly exchanged email. Is that correct? They did exchange email at that particular address. All of a sudden, we've got radio silence when they tried contacting him through the P.O. box or the email. Because the email addresses were not, the emails that were sent were not sent by, they were sent by counsel. And they were not sent, so basically spam was blocking those because they were not emails that had been regularly sent back and forth to him. Seems like he was doing, making a lot of effort to avoid service process here. Okay, I'm going to move on then to the next argument. Okay. I mean, I'm telling, the argument is that he did not get the particular notices he needed to get. He didn't get the charging document. So he had no time to object to the location of the arbitration or the arbitrator or to help choose the arbitrator. Right. So what's the next argument? The next argument is that the location of the arbitration was incorrect. The composition of the panel. The arbitration provision in the nomination agreements refers to the thoroughbred, the thoroughbred breeders association. Little lowercase t, thoroughbred breeders without an apostrophe, without a possessive apostrophe association. There are many thoroughbred breeder associations in this country. There's one in England, yes, but that had no connection with this dispute. There's one in Ireland and there's one in California. The district court acknowledged that there were more than one TBA when it stated in its 2012 order, because the agreements do not specify which TBA is to be used in the event of arbitration, it was reasonable for petitioners to choose the TBA in England, and that is that supplemental excerpts of record number page 13. The nomination agreements were executed in the Republic of Ireland. The stallions that were subject of the agreements were all located in Ireland. The mayors were bred to those stallions in Ireland. The interest rate set to be charged on each contract in the agreement was set. Is Lindley from Ireland or from the United States? The Lindley's from Ireland. Yes. It seems to me that if you haven't designated, if you haven't been specific about the country and you talk about a TBA, that your client might well have welcomed the opportunity of conducting an arbitration someplace other than Ireland when he was dealing with an Irish corporation on horses in Ireland. It seems to me that he might well have said, gee whiz, if you want to do TBA, if you want to do the Thoroughbred Breeders Association in New York, I won't have any objections, and especially if you want to do it in California. Any place but Ireland. I'm trying to figure out what the prejudice is here. Prejudice is, as we later established, that the problem with the English, particularly the English TBA, is that the English TBA has a lot of connections to Coolmar. Coolmar has financial You mean to people in Ireland? Yes. Would the Irish, would the TBA of Ireland have had any connections to Thoroughbred Breeders in Ireland? But he agreed that with personal jurisdiction with respect to something in Ireland, and there's no personal jurisdiction with respect to something in England. It's as if he went to Timbuktu. Why would that be appropriate? There is no connection to this particular agreement. This particular agreement says the Thoroughbred Breeders Association. One would assume it was the one in Ireland or the one in the United States. But you just told me that there were a number of those. Yes, there are a number of those. And did it say the Thoroughbred Breeders Association of Ireland? No, it didn't say that. But it didn't say the Thoroughbred Breeders Association of England either. So they picked one. Why do they get to pick one? There has to be jurisdiction over the parties. The way that you get jurisdiction is the agreement says that this is where we're going to arbitrate the dispute or that this particular entity is going to appoint the arbitrators. Certainly, the other side understood, Lindley understood that it was supposed to be at least an arbitrator from Ireland in Ireland that was supposed to be appointed. When they wrote to the Thoroughbred Breeders Association of England, they asked for an Irish arbitrator. The Thoroughbred Breeders Association of England did not appoint, for some reason that we don't know about because we weren't parties to this whole thing, they appointed somebody in England who had deep connections to Kumar, which is Lindley Investments. Deep connections, deep financial ties and relationships. The other argument that we have made is that the composition is that there was no notice of a hearing and there was no hearing. Okay. The arbitrator just made the decision based upon the representations of counsel, did not submit. And I understand that there could have been submissions based upon declarations by the parties, but there were no party declarations. This was simply representations of counsel. Did your client state in his declaration that there's no, that to his knowledge there was no TBA in Ireland? Yes, he did. Okay. So now I'm really confused, counsel. Well. Why is your client objecting when they went to somebody in Ireland if to his knowledge there is no TBA in Ireland? But there is a TBA in Ireland. He wanted to go to the TBA in the United States, but he would have taken Ireland but not England. At least those two would have been reasonable. There would have been a reasonable connection. But if there is no TBA in Ireland. There is a TBA in Ireland. He was wrong. There is a TBA in Ireland. And the other side does not dispute that there was a TBA in Ireland. I'd like to preserve the remaining time. All right. If it pleases the Court, I'm James Morgan. I represent Lindley Investments and the other partners of Lindley Investments who are the petitioners and appellees herein. The Court is to confirm a foreign arbitration award unless the appellant shows and demonstrates on the record that one of the expressly enumerated defenses appear. Here it appears they're contesting the reasonableness of notice. They're contesting whether the arbitration agreement is consistent or arbitration was conducted in a manner consistent with the agreements. And they're contesting that there was a public policy violation based apparently on bias. The appellant asserts that notice can only be accomplished by personal notice or an admission of actual notice. That is inconsistent with Malane and the string of cases that cite that where the notice given here and in all cases should be reasonably calculated under all the dependency of the action and the opportunity to participate. Here the appellees employed the same communications that they had used to communicate with the appellant for the years that they had been doing business with them. That is the email address, which is jammer999, the fax number, and the P.O. box 1810 in Manhattan Beach, California, the same P.O. box and method of communication chosen by the appellant in each and every arbitration. So I'm just curious about, he, Demochian lived in California and your clients in California or your clients in Ireland? No, thank you. My clients are headquartered in Ireland. Okay. The clients are citizens of the Isle of Man in the Republic of Ireland. Okay. So your client from Ireland, you representing him, were sending all these notices to this man here. Right. Okay. So why, so was there ambiguity in the forum for having the arbitration? Ambiguity, I think in order to address that we need to visit those nomination agreements. And there's 14 of them. They appear throughout the records. And they're all the same form. The phrase, the Thoroughbred Breeders Association, appears six times in each of those agreements. Not once does it say the Ireland Thoroughbred Breeders Association. You'll note in the communications to and from counsel and the arbitrator that the letterhead is Thoroughbred Breeders Association. The declaration of Christy Grassic, the manager of the Coolmore operation in Ireland, found on supplemental excerpts at page 39, says the custom and practice for dealing with arbitration-related disputes under these of them every year is to contact Thoroughbred Breeders Association, which happens to be headquartered in the United Kingdom. You'll also find- Why is that? Why is that? Because- Could you explain why? It's the- The larger- It's a consolidated group. It has something to do with the coordination of the breeding operations in Ireland and throughout the United Kingdom. I don't believe there's a comment on that on the record. You'll find that in addition to Mr. Jambolichan's address being in all 14 nominations, that paragraph 14 of each nomination agreement contains an arbitration clause. And the arbitration clause frees the parties up to agree to arbitrate their matter anywhere they choose, with anyone they choose. And it does not come into play unless they can't agree on an arbitrator. And in that case, in only that case, either party can petition the council for the Thoroughbred Breeders Association. Again, we know the custom and practice is the one located in England. And they can request that they appoint an arbitrator, which is exactly what happened here. With respect to notice, I think it's important to highlight some of the chronology. On December 10th and 11th, 2009, it's found in the supplemental excerpts at 185 and 187, the appellant tells the appellee, you'll get every penny that you're owed, I'm going to pay you 100% of what you're owed. Then the climate changed, and on December 21st and 29th, this is also found in SER 166 and 189, the appellant announced, it's going to take years to get this paid, and by the way, and this is crucial to the notice requirement, by the way, don't contact me anymore. I'm now represented by Mr. Ronald Caswell. All your communications should go to him, and his email address is this, and his address is that. So let's talk about what kind of notice that the appellee gave at that point. On February 18th, 2010, he sent 14 separate letters to the PO box that's in every arbitration agreement, and he also sent them to the JAMR 999 email address that had been used in the communications, and were in fact used by the appellant himself in delivering those December emails, advising them, first, he's going to pay, second, he's never going to pay. That's the custom and practice of how they were dealing with each other. Ten days later, when there was no response, and it wasn't as counsel suggested, I would suggest to you it says, we have this dispute, either pay or we'll initiate the arbitration processes manifest in the nomination agreements. Ten days later, the attorney for the appellee notified the appellant that, okay, these are three arbitrators in Ireland, if you want Ireland, that we would agree, or if you don't like them, why don't you nominate someone in Ireland? Otherwise, in 28 days, as indicated in paragraph 14 in each and every nomination agreement, we'll have to apply to the Thoroughbred Breeders Association and let them pick. That's what happened. What's crucial here is this time, after the February 28th letters, again, 14 to the appellant at his email address and his P.O. box, and 14 to his attorney at his email address and P.O. box, this time the appellant's attorney responded on March 11th, 2010, and he says, I'm not representing the appellant anymore. Please don't forward me any more notices. I will simply discard them. The appellant in the district court level signed a declaration that says, I never authorized that attorney to represent me. He's not authorized to deal with this case, and notices to him aren't the equivalent of notices to me. The district court dismissed that as not credible, given the fact he had sent these emails advising the appellees at a crucial time period, when he's already late with his payment, to do all the communications through his attorney. At that point, the appellees contacted the Thoroughbred Breeders Association. All the letterhead from them says Thoroughbred Breeders Association. And then the arbitrator also did notices that were reasonably calculated to give the appellant notice of dependency of the action by sending him a letter on June 7th, 2010. He sent him, but he didn't hear from him in a month and a half. He sent another letter, and you'll see in the chart in the brief, he sent it by mail. He sent it by email, which was noted to be received, and he sent it by fax, which was noted to have gone through. On August 16th, there was another intent to rule sent out. If you don't answer, I'm going to intend to rule. August 23rd, their initial drafts went out. September 3rd, the other drafts went out. There was an abundance of effort by the appellees to give him notice. This is in contrast to the Seed case that was cited in the supplemental route. The Seed case said that the person seeking to give notice of the arbitration gave it in Chinese when all the custom and practice had been in delivering it in English. They said that's designed to hinder giving notice. Here, both the appellees, their attorney, and the arbitrator himself did extraordinary efforts to give them notice. We understand that it's the appellee's obligation to provide the appellant with reasonable notice so that they can be heard and present their case. However, once they do that, it is the appellant's responsibility to avail themselves of that opportunity. Showing that you are unable to participate is not the same as being unwilling to participate. Avoiding an arbitration and ignoring the process is not enough to create an enumerated defense. With respect to the second allegation that these proceedings were inconsistent with the 14 nomination agreements, I would refer you to the nomination agreements. It sets forth the process. If you don't like going in Ireland, if you don't like doing it in England, agree to somebody. The appellees made reasonable efforts to contact both the appellant and his attorney while he was represented by the attorney and said, hey, here's three guys we'll approve of. If you want to nominate somebody, have at it. There's no showing that this gentleman was hand-selected. He was not one of the three that he had suggested to the Thoroughbred Breeders Association. It was rejected. In terms of bias, there's been no showing, as the district court found, of impartiality, improper motive, and any relationship. Out of concern, the district court allowed discovery on this issue. As a result of discovery, it was shown that there was no financial relationship or connection between the arbitrator and the appellees. There had never been any payment for services or payment for horses or horse transaction between the two. And there was no business interest between the two of them that could be found. There was simply no connection. It was said, and Brandeis is a case that everybody cited, that in these small insular businesses like the thoroughbred breeding operation, the fact that parties cross wakes, they deal in the same circles, is not evidence of an appearance of bias. And we would agree with that. In the Froticrome case, in terms of public policy, the court is instructed to invalidate sparingly when foreign states, unless a judgment violates the notion of morality and justice in the foreign state. So we would ask that you confirm the district court's ruling. We believe that notice was given, an abundance of notice was given, in the manner that the appellant themselves directed and in the manner that the appellant themselves chose to communicate. There is no evidence in the record that the appellees ever had his home address. That was done through some investigation at the time we had to personally serve him with this petition. And even when we served him at the address, his attorney indicated she was going to file a motion to quash because he wasn't home and the teenager that was served was underage. So we actually served him at the racetrack while he was watching one of his horses to be saddled. There was no clear error. With Santa Anita or Del Mar? With Santa Anita. Santa Anita? Yeah. All right. There's been no clear showing of any error by the district court.  Yes, thank you, Counsel, on the merits. We were concerned this morning because we could not, you weren't here and we couldn't locate you. I apologize to the court. I was in the wrong courtroom. I asked which one and I was directed to the wrong courtroom and I didn't realize that until I was fetched. Well, I'm glad we found you. Thank you very much. Thank you very much, Counsel. The district court found that the agreement was ambiguous and that determination and he found that there were many agreements, many TBAs. That determination is entitled to deference and reviewed under the clearly erroneous standard. He also confirmed the arbitration award. He did, but my point about that is he, yes, and that decision is reviewed de novo. Factual findings, the legal finding is reviewed de novo and the factual findings, which this was, is reviewed to determine whether it's clearly erroneous or not. And I'm saying that he determined the contract was ambiguous. He then, though, determined that might as well let the people decide, because it's ambiguous, you can just let the Petitioners decide where they feel like filing. It can be at any TBA at all. This particular dispute had no connection to England and that is why we are objecting to that. With respect to bias, the standard is not, we're not talking about actual bias. There's two aspects to bias. One is actual bias and the other one is whether or not there was notice of the, whether there was disclosure, bias disclosure. And there was no bias, there was no disclosure here of the bias. Thank you. All right. Thank you, Counsel. Lindley v. Jemotian will be submitted and this session of this court is adjourned for today. Thank you. All rise.
judges: Wardlaw, Bybee, Bell